VERMONT SUPERIOR COURT

Environmental Division

32 Cherry St, 2nd Floor, Suite 303,
Burlington, VT  05401
802-951-1740
www.vermontjudiciary.org



ENVIRONMENTAL DIVISION

Docket No. 98-7-17 Vtec

| | |
|---|---|
| Poultney Properties, LLC<br>Change of Use & SP Application | DECISION ON THE MERITS |

**DECISION ON THE MERITS**

Poultney Properties, LLC (Poultney Properties) appeals the partial denial of its application for change of use and site plan approval by the Town of Poultney Development Review Board (DRB).  Several self-represented neighbors, Neal C. Vreeland, Linda S. Pepler, Rebecca and Walter Ribeiro, and John G. Swenor, participated as intervenors in this matter.  A group of Poultney residents, Concerned Citizens of Poultney (CCP), joined the appeal as an interested party to oppose the application with Charles Hall as the group's spokesperson.  The Town of Poultney (the Town) took an active role in this matter and is represented by Gary R. Kupferer, Esq.  Poultney Properties is represented by David R. Cooper, Esq., and Rodney E. McPhee, Esq.[1]

This appeal solely regards Poultney Properties' application for a retail store at 61 Beaman St. in Poultney, Vermont, which the DRB denied in the same decision it approved the proposals for the other buildings on the property, located at 53, 55, and 57 Beaman St.  Poultney Properties raises five questions for the Court's review in its October 6, 2017 Clarified Statement of Questions (SOQ).  The Court resolved Questions 2, 3, and 5 in its November 26, 2018 pre-trial decision on cross-motions for summary judgment.  In the November 2018 decision, the Court concluded that § 1411 and § 601(E) do not apply to the application because 61 Beaman St. contains preexisting nonconforming structures, and § 415 does not apply because the application is subject to site plan review, not conditional use review.  Only Questions 1 and 4 remain for trial, which ask:

---

[1] Attorney McPhee replaced Paul S. Kulig, Esq. who actively represented Poultney Properties during trial.

1. Whether the Project is entitled to site plan approval under Section 1203 of the Bylaws?

4. Whether Article VII of the Bylaws applies to and/or is enforceable against the Project (or, in the alternative, whether the Project complies with Article VII[2])?

The Court conducted a three-day remote trial on November 8, 9, and 10 of 2021 using the WebEx platform. This matter was initiated in July 2017 and parties were preparing for trial in the fall of 2019 when Poultney Properties requested a continuance, as the Property was under contract for sale to a new owner. The transaction did not take place and the parties resumed trial preparations in the spring of 2020 when the Covid-19 pandemic significantly modified the judicial system, making in-person trials not possible. The self-represented litigants objected to a remote trial and Poultney Properties, while not happy with the delay, acquiesced to continuing the trial for what turned out to be more than a year and a half. As the Judiciary worked to reopen during the summer of 2021, the Vermont Supreme Court's Administrative Order No. 49 and its several amendments continued to require remote court proceedings as much as possible. After discussing the situation and hearing from all parties during several pre-trial conferences, the Court ordered that the trial in this matter be heard remotely using the WebEx platform. This decision was made on the record of the August 30, 2021 conference.

The Court's specific Findings and Conclusions regarding its decision to hear this matter remotely can be found in the audio record of the August 30, 2021 conference. The Court weighed the competing interests of affording all parties a full and fair opportunity to be heard and martialing this matter to conclusion by permitting any party feeling that they could not effectively participate remotely to appear in-person at the Costello Courthouse in Burlington for the trial. The Court additionally gave parties the opportunity to pre-file written testimony and conducted two final pre-trial conferences using Webex so that all parties could practice remote participation.

All parties were present and participated remotely for each of the three days of the trial and all parties had the opportunity to present evidence and examine witnesses.

---

[2] Article VII concerns nonconformity issues.

2

**Site Visit**

The Court completed a site visit on its own on February 7, 2021. Following trial and prior to the site visit, parties were allowed to file request for the Court to observe certain aspects of the Project site and surrounding area. The Court made the observations as requested, however, it did not travel to other Dollar General locations.

**Findings of Fact**

1. Poultney Properties, LLC, owns a single parcel on Beaman Street, which is Route 30, in Poultney, Vermont (the Property) which is 1.76 acres.

2. The Property contains four separate buildings with street addresses of 53, 55, 57, and 61 Beaman Street. The buildings predate the Poultney Unified Bylaws (Bylaws) and have shared a single parcel since before the Bylaws were enacted.

3. The buildings at 55 and 61 Beaman Street have not been occupied for a few years. 57 Beaman Street has been used continuously as a woodworking shop.

4. The former owner of the Property, Vermont Electro-Mechanical Assembly Services (VEMAS), used the multiple buildings for light industry.

5. On February 23, 2017, Poultney Properties submitted three applications relating to the Property to the DRB. The DRB merged these applications into one.

6. Poultney Properties seeks to remove the historic barn at 53 Beaman, to install a college-run woodworking shop and classroom at 55 Beaman, to continue the woodworking shop at 57 Beaman, and to introduce a retail store (Dollar General) at 61 Beaman.

7. On June 28, 2017, the DRB approved the application with respect to 53, 55, and 57 Beaman. It denied the application for a retail store at 61 Beaman.

8. Poultney Properties timely appealed the DRB's denial of the retail store to this Court on July 26, 2017.

9. The buildings on the Property do not comply with the Bylaws' setback requirements. This nonconformity predates the Bylaws.

10. The Property is accessed from streets with residentially zoned frontages, which does not comply with the Bylaws. The Property's access predates the Bylaws.

11. Most of the Property is located in the Village Industrial zoning district. Light industrial and retail uses are permitted in Village Industrial district, subject to site plan review.

12. A small portion of the Property's parking lot is in the Village Residential zoning district. See Vreeland Exhibit 34.

13. The adjacent properties along the north side of the Property (and the west side of the parking lot) are residential and are located in the Village Residential zoning district. The west and south side of the Property abuts the Village Commercial zoning district.

14. Situated in walking distance from both residential areas and the shops and restaurants along Main St., the area around the Property includes mixed land-uses such as an auto parts shop, an auto repair shop, a food shelf, a church, a Dunkin Donuts, and a hardware store. See Poultney Properties Exhibit 2.

15. Neal Vreeland owns and resides in the residence at 27 Church Street. His southern property line abuts the northern border of the Property.

16. Rebecca and Walter Riberio own and reside in the residence at 55 Church Street. Their property also abuts the northern border of the Property

17. John Swenor owns the Schoolhouse Apartments at 88 Main Street, which abuts the west boundary of the Property.

18. Linda Pepler owns and resides in the residence at 80 Beaman Street/Route 30, which is across the street from the Property.

19. Leap Frog Childcare is located on the east side of Beaman Street/Route 30 across from the 61 Beaman building.

**Proposal for 61 Beaman St.**

20. Poultney Properties seeks to convert the 10,056 square-foot building at 61 Beaman (the Project Building) into a retail space occupied by Dollar General (the Project).

21. A retail store will require new lighting, alterations to the loading area, alterations to the front entrance, more frequent truck deliveries, truck entry and exit routes, a dumpster, landscaping and screening, modified hours of operation relative to the prior use, and increased customer circulation.

4

22. The Dollar General's proposed hours of operation are from 8:00 a.m. to 10:00 p.m., seven days a week. This is a change from prior use, which generally operated between 7:00 a.m. to 5:00 p.m., Monday through Friday, along with occasional weekend activity such as building and equipment maintenance and an antique shop in the barn building.

23. The Bylaws regulate quiet hours from 12:00 midnight to 7:00 a.m.

24. The number of employees on-site for the operation of the Dollar General will typically be four, up to a maximum of ten employees.

25. The Project will involve one delivery per week by a Dollar General truck during operating hours (size of truck can vary depending on need and store location). Other regular deliveries throughout the week could include: propane, garbage pick-up, grocery and beverage restocks.

26. The Project will not increase the burden on municipal services. For instance, there will be less employees than previous businesses and consequently a decrease in the use of water and sewer services.

27. The Project will not generate any of the following with the potential to cross the Property boundary: odors, fly ash, dust, fumes (beyond auto emissions), vapors, gases, air pollution, vibrations, glare, lights, reflections, nor the risk of fire explosions.

28. The building is heated with propane as a fuel source. The Project will continue to use the existing HVAC equipment.

**Proposed Modifications to the Property and the Project Building**

29. Poultney Properties proposes to make the following changes to the Property and the Project Building at 61 Beaman St. as part of the Project:[3]

    a. Add a new sliding-glass storefront entry on the front façade of the Project Building. See Poultney Properties Exh. 5.

    b. Add a sidewalk along the front façade of the Project Building to accommodate pedestrian movement between the parking lot and the main entrance.

---

[3] This list of proposed modifications to the Property and Building 61 includes those that Poultney Properties proposed in its application as well as those additional modifications it agreed to make on the record at trial.

c. Black-out the windows on the north and south sides of the Project Building so that interior lighting will not be visible from the outside on those sides.

d. Add a six-foot tall stockade fence along the western boundary of the parking lot to provide screening for the abutting residence at 17 Church Street, constructed in a manner that prohibits vehicle headlights from shining through to the abutting property.

e. Add a ramp that is twenty-feet long and six-feet wide on the northwest portion of the existing loading area along the southern side of the Project Building.

f. Add a chain barrier at the rear (westerly) end of the loading area, stretching from 61 Beaman to 55 Beaman, to modify vehicle circulation on the Property that can be removed to enable emergency access

g. Exterior lighting will include five lights in the parking lot, one existing light on the northern side of the Project Building and three new lights (one on the north wall and two on the south wall) on the exterior of the Project Building. Poultney Properties submitted a photometric light plan that shows that all lights will be downcast and designed to comply with dark sky requirements, and so light does not extend onto adjacent properties. See Poultney Properties Exh. 6 and 7.

h. Reduce the number of parking spaces from 36 to 29, with 27 standard 10 feet by 20 feet spaces and two handicap-accessible spaces; town regulations require a minimum of 21 spaces.

i. Permanently close the northern entrance to the parking lot from Church Street and add landscaping that will obstruct the entrance without interfering with the intersection of Church Street and Route 30.

j. Remove the barn structure located at 53 Beaman in the southeast corner of the Property and add landscaping in a portion of the area occupied by the barn with a row of three to five feet tall evergreen shrubs extending west from the eastern edge of the Property to 55 Beaman.

k. Add plantings in accordance with Bylaw Section 201(D)(2) in two locations: (i) where space allows between the north side of the Project Building and the

6

abutting residential properties, including 27 Church Street (Mr. Vreeland's property) and 39 Church Street, and (ii) along the western boundary line of the Property that boarders Mr. Swenor's property at 88 Main Street (the Schoolhouse Apartments). There is insufficient space for similar plantings between the existing building and the Ribeiro property at 55 Church Street.

l. Add a dumpster for trash and recycling in the rear (west) of the loading area.

30. The Property has a new snow removal plan with three areas of on-site storage.

31. The proposal for signage in the original application has been withdrawn. No signage is currently proposed.

**Traffic Circulation**

32. The Project will increase peak traffic conditions on the adjacent street system by adding 11 new trips to the weekday morning peak period and 50 new trips to the weekday evening peak period (counting entrances and exits individually).

33. There is excess capacity at the nearby intersections of Church Street and Route 30 and Main Street and Route 30.

34. The Project is expected to create an additional traffic delay of less than 1 second.

35. The Level of Service in the area around the Project during peak conditions is A or B.

36. The entrance and exit to the Project is on Route 30. The stretch of Route 30 in front of the Property is straight and flat, with one lane in each direction.

37. Route 30 has a speed limit of 30 MPH requiring a minimum site distance of 200 feet. The Project's entrance/exit has site distances in excess of 200 feet. The light signal at Main Street and Route 30 is 260 feet from the Project entrance/exit.

38. There has only been one accident on the section of Route 30 adjacent to the Property in the past five years (2017 – 2021). The accident occurred in the intersection of Route 30 and Main Street on October 27, 2020 and did not result in injuries or fatalities.

39. Delivery trucks will enter and exit the Project from Route 30. Delivery trucks may be smaller box style or larger tractor-trailers having a maximum length of 73.5 feet (tractor-trailer plus 53-foot trailer). The tractor-trailer style trucks are 8.5 feet wide.

7

40. The 73.5-foot tractor-trailer (the WB-67) is the largest truck that can operate on Vermont Roadways without an oversize permit.

41. The loading area is approximately 3,100 square feet in total. It is about 140 feet long along the south side of the Project Building. The distance between Buildings 61 and 55 is approximately 35 feet.

42. The loading area is large enough to accommodate four 73.5 foot tractor-trailers, however, it is unlikely that these trucks could maneuver in or out of the loading area if more than one truck was present.

43. The larger tractor-trailer delivery trucks have two options for turning movements when accessing the loading area of the Project Building.

44. One option is for a delivery truck coming from the south on Route 30 to drive forward into the parking lot area in front of the Project Building and then back into the loading area. This option allows trucks to leave the site by driving forward out of the entrance/exit onto Route 30.

45. Alternatively, delivery trucks coming from the north on Route 30 can pull forward into the loading area to unload and then leave by backing out in front of the Project Building into the customer parking area in order to then pull out onto Route 30. This pattern requires the truck to back up around the corner of the Project Building into the parking area without clear views of the back of the trailer.

46. These delivery truck turning movements are not unique to the Project.

47. There is some degree of pedestrian use of the parking lot which has occurred at times that the Project Building was historically occupied and more recently while unoccupied.

48. Pedestrian use of the parking lot is likely related to the way the existing public sidewalk on the south side of Church Street terminates without a crosswalk at the intersection of Church Street and Route 30, and the absence of a public sidewalk on the west side (the Property's side) of Route 30. Poultney Properties' application does not alter this pedestrian dynamic.

**Noise**

49. Poultney Properties, LLC retained VHB to complete a noise and vibration study. Noise measurements of the current building and rooftop HVAC equipment were collected in several locations including the rooftop, ground level, near equipment, and in the parking lot. Sound modeling was also completed to evaluate noise levels. Poultney Properties Exhs. 14 and 15.

50. The Project is expected to have two predominate sources of noise, that generated by the existing rooftop HVAC equipment and noise generated by parking lot activity.

51. Measuring the daytime noise generated by the rooftop HVAC system at its loudest, in cooling mode, from the edge of the roof near the closest residential property line, the HVAC system had an average sound level of 61 dBA (Leq) and a maximum instantaneous level of 67 dBA (Lmax) lasting for 1 to 2 seconds during the equipment startup.

52. Nighttime noise generated by the rooftop equipment was modeled, instead of measured, at ear-level (five feet above ground) on the closest property line and at the level of the closest residence's upper-floor window (20 feet in the air).

53. The ear-level noise averaged approximately 40 dBA (Leq) at adjacent residences, with maximum instantaneous levels during equipment start-up of about 46 dBA (Lmax).

54. At the 20-foot level representing the upper-floor windows of the nearest residences, the average sound levels were approximately 40 to 45 dBA (Leq) and the maximum instantaneous levels were approximately 46 to 51 dBA (Lmax).

55. The rooftop equipment has been operating for approximately 10 years and Poultney Properties does not propose to replace it.

56. To assess noise that could be generated by parking lot activity, VHB measured the sound levels of a diesel truck driving inside the parking lot, backing up into a parking space, and idling. VHB also measured the sound levels of a passenger car parking and closing the side doors and trunk. The measurements were taken in the northern end of the parking lot at the property line of the nearest residence, with the microphone located within three feet of the vehicles.

57. The maximum instantaneous sound levels from the parking lot activities ranged from 70 to 72 dBA (Lmax).

**Prior Use of 61 Beaman**

58. Prior use the building was light industrial while the proposed use is retail.

59. The Williams Machine Company operated out of the Project Building until 1987, and JRL Industries operated out of it until 2002.

60. After being acquired by John Leiber in 2005, Vermont Electro-Mechanical Assembly Services (VEMAS) operated out of the Project Building from 2007 until 2015 or 2016.

61. Leonard Knappmiller purchased the Property at auction in 2016.

62. VEMAS had about 75 employees during some periods and manufactured printer circuit boards for military and commercial purposes.

63. Tractor-trailers delivered to the site regularly, sometimes daily, and at times customers would pick up products as well.

64. These trucks would enter from Route 30, travel down the alley between the Project Building and 55 Beaman, and then turn left toward Main Street. The trucks sometimes backed up at that point to a loading area of the Project Building. These trucks would exit onto Main Street.

65. VEMAS operated Monday through Friday from 7:00 AM to 3:30 PM for manufacturing, with office hours extending to 5:00PM.

66. There were limited times when VEMAS operated a second shift of five to ten manufacturing employees until 9:00 PM, and sometimes as late as 11:00 PM.

67. Mr. Leiber operated a small antique business out of the barn building that was open to customers on some weekends.

68. VEMAS building and equipment maintenance took place on Saturdays.

69. VEMAS used a dump truck with a ten-foot plow to move snow. If there was considerable accumulation, a backhoe would be used on weekends to move the snow to more remote areas on the property.

70. VEMAS never received traffic complaints and only had one minor accident with a truck hitting a sign bracket on a neighboring property.

**Conclusions of Law**

1. <u>**Whether the Project is entitled to site plan approval under Section 1203 of the Bylaws?**</u>

Poultney Properties proposes to modify the Project Building at 61 Beaman Street to accommodate a retail store. The majority of the Property, including all of the Project Building, is located in the Village Industrial (VI) zoning district while a small section of the parking lot near the northern property line is located in the Village Residential zoning district. The Court finds, and the parties do not dispute, that the Project should be evaluated under the requirements for properties in the VI district. Retail, like the previous light industrial use of the building, is a permitted use in the Village Industrial zoning district that is subject to site plan review. Bylaws Article III, Table of Uses. Section 1203 of the Bylaws sets out the requirements for a site plan review, which include consideration of the adequacy of traffic access, circulation and parking, and landscaping and screening.[4]

### a. Adequacy of Traffic Access, Circulation and Parking

Section 1203 specifies the following factors under the first two objectives for site plan review:

A. Maximum safety of vehicular circulation between the site and the street network. Particular consideration shall be given to visibility at intersections, to traffic flow and control, to pedestrian safety and convenience, and to access in case of an emergency.

B. Adequacy of circulation, parking and loading facilities. Particular consideration shall be given to the items in (A) above and the effect of noise, glare, or odors on adjoining properties. Refuse and service areas should be included in this consideration. Provisions for snow removal should also be made. The standards under Article VI Parking Requirements must also be met.

Bylaws § 1203(A) – (B). The Project's circulation patterns, the impact on existing traffic, the effects of the proposed chain barrier, the truck delivery routes, and the overall safety considerations for suppliers, customers, and pedestrians are all part of the Court's review of these factors.

---

[4] Section 1203 may also require a review of the use of renewable energy resources, however, because the Property and its buildings are preexisting, we do not undertake this review.

11

The Court finds that the proposed Project will provide maximum safety of vehicular circulation between the site and the street network. The main entrance and exit to the Property is located on Route 30, which has a speed limit of 30 miles per hour. The minimum stopping sight distance recommended by the American Association of State Highway Transportation Officials (AASHTO) for a 30-mph roadway is 200 feet. See Poultney Properties Exh. 9. The stretch of Route 30 in front of the Property is straight and flat, with one lane in each direction. The visibility at the Project's entrance/exit is more than adequate as the sight distances exceed 200 feet in both directions. The plantings proposed for the barn location are low shrubs that will not interfere with these sight distances.

Trucks making deliveries to the site will benefit from the good visibility in either direction and the wide entrance/exit driveway on Route 30. Edward Dumas, a truck driver who retired in 1995 after driving for 62 years, testified that he used to drive tractor-trailer trucks to and from the Project site when it was Williams Machine Company and he never had issues with site distances, accidents, or congestion. He further opined that the proposal to remove the barn would make truck maneuvering easier. There has only been one accident on the section of Route 30 adjacent to the Property in the past five years (2017 – 2021). The accident occurred in the intersection of Route 30 and Main Street on October 27, 2020 and did not result in injuries or fatalities. VTrans no longer classifies this section of Route 30 as a High Crash Location. See Poultney Properties Exh. 11.

The Project will not adversely impact traffic flow or create unsafe traffic conditions. Looking at peak traffic conditions, the Project is expected to add 11 new trips to the weekday morning peak period and 50 new trips to the weekday evening peak period. The intersection capacity analysis admitted into evidence shows that this number of new trips will have a negligible impact on traffic in the area. See Poultney Properties Exhs. 9, 11. There is excess capacity in the nearby Church Street and Main Street intersections with Route 30 so they will still operate at a Level of Service of A or B during peak periods. Traffic generated by the Project is expected to result in a delay of less than 1 second, if any. Thus, there will be no adverse impact to congestion.

12

Customers and delivery vehicles will only be able to access the Project from a single location. The Church Street entrance will be permanently closed in a manner that does not interfere with the Church Street intersection, and there will be a chain barrier blocking the rear access point off of Main Street near the loading area. Closing these two entrances will reduce the potential for vehicle conflicts on-site. The chain barrier is intended to stop vehicles from cutting through the Property on the way to and from Main Street but will not prevent emergency vehicles from accessing the Property that way. Emergency vehicles will be able to remove the chain if necessary. There is also adequate room for emergency vehicles to use the main entrance on Route 30.

The Project also accommodates pedestrian safety and convenience. Along with reducing the potential for vehicle conflicts, reducing the number of access points so that all vehicles will enter and exit in one location will improve pedestrian safety. There will also be a pedestrian walkway along the front of the Project Building from the parking lot to the main entrance. Concerned with the historical pedestrian use of the Property to access Main Street, however, the neighboring parties opposing the Project and the Town assert that Poultney Properties should be required to install a public sidewalk at its own expense on the west side of Route 30, stretching from the corner of Church Street and Route 30 to the southeastern corner of the Property. Pedestrian use of the Property as a path to Main Street stems from the absence of a sidewalk on the west side of Route 30 and the absence of a crosswalk to assist pedestrians in crossing Route 30 in the vicinity of Church Street to get to the east side of Route 30 that does have a sidewalk. While a site plan should accommodate pedestrian convenience, it is beyond the scope of the objective to require Poultney Properties to install what would amount to municipal infrastructure that the Town has either failed or found it unnecessary to install itself. The Proposal does not create the lack of pedestrian amenities nor inhibit the Town's ability to address them, and pedestrians have the option of using the north-south sidewalk connecting Church Street to Main Street about a half-block to the west of the Property. The Court finds that the Proposal adequately accounts for pedestrian safety and, should it even have the authority to do so, finds it unnecessary to require a condition that Poultney Properties install and maintain a pedestrian

sidewalk along Route 30. Poultney Properties has established that the Proposal will not meaningfully impact traffic congestion or create unsafe traffic conditions.

The proposed circulation, parking, and loading facilities within the Project site are also adequate. Starting with parking, the Project must comply with the standards specified in Article VI of the Bylaws, which includes four sections. Section 602 does not apply to the Project because the Project does not require an exemption to the parking or loading requirements. Section 603, requires two parking spaces for every 1,000 square-feet of gross leasable area for a retail store. The Project has a total of 10,056 square-feet, so it needs 21 parking spaces. The proposed reduction in the number of parking spaces from 36 to 29, with two of the 29 spaces being handicapped accessible spaces, complies with this requirement. The Project also complies with § 604, which specifies one space of at least 250 square-feet for every 3,000 square-feet of floor area. The Project's 3,100 square-foot loading area exceeds the requirement for the 10,056 square-foot building. In further compliance with § 604, the loading area is also paved and located on south side of the Project Building, which is the farthest side from the residential properties and does not encroach on buffer areas.

Section 601 has multiple subparts. All of the Project's parking spaces will be at least 200 square-feet in conformance with § 601(A), and no fractional spaces are required under § 601(B). The Project's compliance with § 601(C)'s requirements for lighting, screening, and driveway access are discussed elsewhere in relation to the other requirements of site plan review. The Project is not subject to § 601(D) because it is not in a residential district. The matter of the Project's compliance with § 601(E), prohibiting access from residentially zoned frontages, is no longer before the Court. In the November 2018 decision on motions for summary judgment, the Court held that § 601(E) does not apply because the Property's access points are preexisting nonconforming structures that predate the Bylaws. Poultney Properties LLC Change of Use & SP App., No. 98-7-17 Vtec, slip op. at 10 – 11 (Vt. Super. Ct. Envtl. Div. Nov. 26, 2018) (Walsh, J.). To the extent that the parking lot could be subject to § 601(D) because the northern end of the lot is located in a residential zoning district, the same exemption as a preexisting nonconforming structure applies. Poultney Properties, No. 98-7-17 Vtec at 10 – 11 (Nov. 26, 2018). All the lights in the parking lot will be cast down and designed so they do not shine into adjacent properties in

14

conformance with § 601(F). The parking lot will be screened and lighted in accordance with § 601(G). Only one side of the parking lot adjoins residential property, and that side will be screened with a solid six-foot fence designed to prevent light from shining through. The Project also complies with the screening required by § 601(H), as is discussed in relation to § 1203(C) below. The Project meets the requirements of Article VI of the Bylaws.

The Town and neighboring parties' main objection to circulation and loading on the Project site is with truck turning movements into and out of the loading area. As the size of the trucks delivering to the Project will vary, Poultney Properties conservatively focused its evidence on the adequacy of site circulation for the largest delivery trucks allowed on Vermont roads without an oversize permit (the WB-67 tractor-trailers). This approach follows the logic that other trucks will be able to safely maneuver within the site if there is enough space for the largest 73.5-foot tractor-trailers to do so. The loading area is approximately 3,100 square feet in total and about 140 feet long on the south side of the Project Building. While this space could fit multiple 73.5-foot trucks, only one could likely enter or exit the loading area at a time.

Analysis completed by traffic engineer David Saladino, an expert witness for Poultney Properties, using industry-standard software shows that the largest tractor-trailers have two options for maneuvering within the site when accessing the loading area. Poultney Properties Exhs. 9, 10. Under one option, a delivery truck coming from the south on Route 30 could drive forward into the parking lot area in front of the Project Building first (instead of straight into the loading area), and then back around the corner of the Project Building into the loading area. This option allows trucks to leave the site by simply driving forward out of the loading area to the exit. Alternatively, delivery trucks coming from the north can pull directly into the loading area cab-first and then leave by backing around the corner of the Project Building into the parking area in order to drive forward out onto Route 30. This pattern requires the truck to back up into the parking area without clear views of the back of the trailer.

Testimony during the trial established that while the first option is preferable, large tractor-trailers can maneuver into and out of the loading area safely under either option. Jack LaRock, a delivery driver for Dollar General with experience driving large tractor-trailers and familiarity with the project site, testified that the first option is preferrable because it would be

15

easier to maneuver and because backing into the loading area better positions the trailer for unloading purposes. He opined that drivers with experience of the site would plan to approach the site from the south to avoid the second option, which inefficiently positions the door of the trailer farther from the loading doors and involves a more difficult back up maneuver. Mr. LaRock's concerns about the second option aligned with that of John Ennis, a tractor-trailer driver who testified as part of Mr. Vreeland's case, who disliked the second option because it meant backing into a parking lot with pedestrians and vehicles without being able to see the back of the trailer. Both testified that a driver could safely maneuver the first option but would require one or more spotters to safely execute the second when backing into the parking lot.

While the site is limited in the number of deliveries it can accommodate at the same time, Mr. LaRock confirmed that there are straight forward options available to drivers who arrive while another truck is in the loading area. The driver can call the store manager for information about when the delivery will be finished and wait in a nearby truck stop or make another delivery and return to the site at a later time. Mr. Dumas also testified that when making deliveries to the Project site while it was Williams Machine Company he would return at a later time if another truck was on-site.

Poultney Properties has established that the site can safely accommodate deliveries from large tractor-trailers approaching the site from the south, and less preferably but still safely from the north if the driver is assisted by a spotter as it backs into the parking lot. In establishing the adequacy of the site for larger tractor-trailers, Poultney Properties also established the adequacy of the site for smaller trucks that require less room to maneuver. See also Poultney Properties Exh. 12. Drivers who approach the site from the north and decide it would be better to do so from the south can use the existing street network to circle around and approach from the other direction. The Project satisfies the requirements for adequate circulation and loading with the imposition of one condition: **We require one or more spotters to assist a tractor-trailer pulled forward into the loading area as it backs into the parking lot when exiting the Property in order to complete the maneuver safely.**

Review of the adequacy of circulation, parking, and loading facilities under § 1203(B) also involves consideration of the effect of noise, glare, or odors from the Project on adjoining

properties, and of the Project's provisions for refuse and snow removal. To the extent that the Bylaws can require consideration of noise related to the Project's parking and loading facilities as part of the site plan review for a retail store, the noise will not have a significant effect on adjoining properties. The sound study commissioned by Poultney Properties measured the noise of a diesel truck driving into a parking space and idling, as well as of a passenger vehicle parking and closing doors in the northern end of the parking lot. Poultney Properties Exh. 14. The measurements represent the noise that could be generated by parking lot activity associated with the proposed retail store and were taken at the property line of the nearest residence. The instantaneous maximum sound levels ranged from 70 to 72 dBA, which is well below the daytime instantaneous maximum limit in the Bylaws of 80 dBA for sound received at a residential property. Bylaws § 1429(A); Poultney Properties Exh. 14. Vehicle activity will be limited to the Project's 8:00 a.m. to 10:00 p.m. operating hours and consequently does not need to comply with the midnight to 7:00 a.m. nighttime performance standards. Bylaws § 1429(A).

The sound study did not include measurements of the noise generated by tractor-trailers, which will either be in the loading area on the south-side of the Project Building or using the portion of parking lot in front of the Project Building to maneuver in or out of the loading area. Tractor-trailers will not need to operate in the northern end of the parking lot near the abutting residential properties where the diesel truck was measured so they are not likely to exceed the allowable limits at the residential property line given their distance from it. Regardless, as the Vermont Supreme Court held in the context of a conditional use review of a truck terminal in an industrial zoning district, noise standards in a zoning ordinance apply to the "noises at the property line emanating from the proposed use itself, and not to sounds created by vehicles passing into and out of the property." In re JSCL,LLC CU Permit, 2021 VT 22, ¶ 23. The Project's compliance with the noise limitations in the Bylaws and with site plan review depends on the noise generated by the retail use itself, not the noise of the tractor-trailers entering and exiting the Property. Noise generated during the turning maneuvers that tractor-trailers complete within the Project are connected to the process of entering and exiting the Property and it would not make sense for the Bylaws to allow retail or industrial uses inside the Village Industrial zoning

17

district while restricting the types of vehicles that commonly service those uses, such as tractor-trailers.  See Id. ¶ 22.

The Project's proposed operation of a retail store will not generate odors, and the lighting has been designed to avoid glare.  All of the parking lot lights will be down-shielded and oriented so as not to shine on adjacent properties, and the windows on the north and south sides of the Project Building will be blacked-out so that interior light will only be visible from the outside through the front entryway.  Refuse and snow removal will also be managed adequately.  The site plan shows that a dumpster will be in the back of the loading area against the existing commercial building and screened from adjacent residential properties by that building and the Project Building.   Snow storage is provided in multiple locations around the Property.

The Project adequately complies with the site plan review objectives listed in § 1203(A) and § 1203(B) with the condition requiring one or more spotters for a tractor-trailer that pulls forward into the loading area to safely back into the parking lot when exiting the Property.

### b. Landscaping and Screening:

The third element of site plan review under § 1203 is whether the landscaping and screening is adequate in the sense that it provides "maximum compatibility and protection to adjacent property," with particular consideration of the goals of "preservation of existing vegetation, visibility of unsightly or incompatible areas from the road and adjoining properties, and the adequacy of landscaping materials to meet seasonal conditions, soil conditions, and light on the site."  Bylaws § 1203(C).  As the Project is in the Village Industrial zoning district, the requirements in § 201(D)(2) are also relevant to the review of landscaping:

> Any lot that is proposed to be developed for any use that adjoins a lot in a residential district or a lot which has an existing residential use as its only use, will be required to provide a landscaped buffer area along the full length of the joint property line. As a minimum, two rows of staggered evergreen trees, planted 10' on center, must be planted 10' off of the boundary line. The Development Review Board may waive this requirement - where the development site includes an existing woodland which will remain undisturbed and is at least 40' deep.

Bylaws § 201(D)(2).

The landscaping and screening proposed as part of the Project adequately furthers the objectives of § 1203(C). Poultney Properties has agreed to install a six-foot fence along the western boundary of the northern end of the parking lot to screen the neighboring residential properties from lights in the parking lot. The fence will be constructed without spaces so that headlights from cars in the lot will not shine through to the residences. Additionally, all of the windows on the north and south side of the Project Building will be blacked out to screen neighboring residences from its interior lights. After the barn in the southeast corner is removed and the northern Church Street access is closed, the visual impact of the Property from the road will be improved by landscaping in both locations. Poultney Properties also proposes to plant two rows of staggered evergreen trees, 10' on center and 10' off the property line, in two locations: (i) where there is sufficient room between the north side of the Project Building and the abutting residential properties, including 27 Church Street (Mr. Vreeland's residence) and 39 Church Street, and (ii) along the western property line that adjoins the Schoolhouse Apartments' property at 88 Main Street.

The Town and neighboring parties assert that the proposed plantings are insufficient for failure to fully comply with § 201(D)(2), especially with regard to the property line along the west side of the parking lot that is shared with 17 Church Street. Their argument is based on the fact that the Church Street properties bordering the northern boundary of the Property and the western side of the parking lot are residentially zoned and consequently entitled to the protection of the landscape buffer required by § 201(D)(2). Compliance with this provision of the Bylaws, however, is complicated by the pre-existing and nonconforming nature of the Property and proximity of existing structures to the shared property lines.

The west side of the parking lot and the north walls of the existing buildings in some sections are too close to the property lines to allow for the minimum § 201(D)(2) plantings because they also fail to comply with setback requirements in the Bylaws. As the Court previously found in its November 2018 pre-trial decision, the existing buildings and parking lot are preexisting nonconforming structures that predate the Bylaws. Poultney Properties, No. 98-7-17 Vtec at 3, 5, 10 – 11 (Nov. 26, 2018). As such, they "may be allowed to exist indefinitely," despite

19

their failure to comply, subject only to conditions on nonconformity in Article VII of the Bylaws. See Bylaws § 707; Poultney Properties, No. 98-7-17 Vtec at 10 – 11 (Nov. 26, 2018).

Poultney Properties has agreed to add plantings in accordance with § 201(D)(2) along the property lines to the north and west of the Project Building where there is space to do so, and will be accommodating the desire for screening on the west side of the parking lot with a 6-foot stockade fence. These additions reasonably balance the requirements of § 201(D)(2) and interests of neighbors with the lawful nonconforming nature of the Property. The proposed Project adequately accomplishes the landscaping and screening objectives of § 1203(C), in addition to those previously considered under § 1203(A) and § 1203(B).

The Court answers Question 1 in the affirmative that the Project is entitled to site plan approval under § 1203 of the Bylaws.

2. **Whether Article VII of the Bylaws applies to and/or is enforceable against the Project (or, in the alternative, whether the Project complies with Article VII)?**

Article VII governs nonconforming uses and nonconforming structures, making a clear distinction between them with provisions that apply separately to each. The Project Building is a preexisting, nonconforming structure that does not comply with setback requirements and other provisions in the Bylaws that it predates related to the distance between the structures and the Property's boundary lines. See Poultney Properties, No. 98-7-17 Vtec at 5 (Nov. 26, 2018). The nonconformity does not extend to the use of the Project Building, as the historical industrial use and the Project's proposed retail use are permitted uses in the Village Industrial zoning district.

This question is specifically directed at whether the proposed renovations to Project Building at 61 Beaman Street to prepare it for a retail use, especially modification of the loading area, are enlargements in the meaning of § 710 that are either prohibited or subject to enhanced review under § 711. See Bylaws § 710(B), (C).

Poultney Properties proposes a number of small-scale modifications to 61 Beaman Street to prepare it for use as a retail store, none of which will significantly change the existing structures. Modifications to the Project Building itself include a twenty-by-six foot loading ramp

20

in the existing loading area, a new storefront entryway on the front of the Project Building, alterations to the windows on the north and south sides of the building so that they are blacked-out, a dumpster in the back of the loading area, and three additional exterior lights. Modifications to the parking area include new lighting, a reduction in the number of spaces, and a six-foot stockade fence for screening. The Church Street access point will be closed and obstructed with new landscaping, and the barn structure will be removed and replaced with some landscaping. The access point in the rear of the Property from Main Street will be obstructed with a removable chain barrier. Poultney Properties also proposes to add plantings where there is room between the north side of the Project Building and the abutting residential properties, and along the western boundary of the Property.

The Court concludes that the Project does not involve an enlargement that could trigger review under § 710 and § 711 as none of the proposed modifications increase the degree of nonconformity of the Project Building or other nonconforming structure on the Property. The façade improvements, the addition of a loading ramp in the loading area, and the sidewalk in front of the Project Building will have a de minimus impact the footprint of the Project Building, if any, and will not expand any structures in the direction of the neighboring residential properties. As the site plan shows, the Project will not change the front, rear, or side setback distances from existing conditions on the Property. Poultney Properties Exh. 4. Other modifications such as removing the barn structure, closing the Church Street access, blacking out the windows, and adding landscaping and the screening fence will likely improve the Property's compliance with the Bylaws from existing conditions instead of taking it further out of compliance. In response to Question 2, the Court finds that the proposed modifications do not enlarge any nonconforming structure in the meaning of § 710 of the Bylaws. In the absence of an enlargement, § 711 does not apply and the Court's inquiry ends with the conclusion from Question 1 that the application for site plan approval for the Project should be approved.

In an effort to bring this multi-year dispute between neighboring property owners to a close, we consider in the alternative, that the Project does involve slight enlargements triggering review under § 711. In so doing, the Court concludes that the Project complies with the requirements of § 710 and the enhanced review under § 711. Assuming any of the modifications

21

to the existing structures could be considered enlargements, the total enlargement or sum of separate enlargements would be far less than 30% of the total area of the nonconforming structure and would not expand the nonconformance further into the side or rear yards, or height measurements, in compliance with § 710(A) and § 710(C).  The front, rear, and side setbacks will stay the same and none of the changes will impact the height of the Project Building.  The Project complies with all other provisions of the Bylaws except for those related to dimensional requirements, as required by § 710(D).

In satisfaction of § 710(B) and based on consideration of the factors listed in § 711, the Court concludes that any enlargement of the nonconforming structure would not have an adverse effect on the surrounding neighborhood.  When conducting the enhanced review under § 711, the Bylaws direct the Development Review Board to "make findings on those of the following factors that the Board deems relevant to the subject application."  Bylaws § 711.  The Court follows the same approach in its review.

§ 711(A): The history of use of the lot.  The Project proposes to transition 61 Beaman Street from one permitted use in the Village Industrial zoning district to another.  See Bylaws Article III, Table of Uses.  To the extent it could be relevant, the historical use of the lot for light industrial purposes does not suggest that enlargements to the existing nonconforming structure on the Property to prepare it for retail use would have an adverse effect on the neighborhood.

§§ 711(B) – (D): The size and location of adjoining and neighboring lots; the uses made of adjoining lots and the impact of the proposal on those uses; the location of existing and proposed structures on the lot and their relation to those on adjoining lots and to the dimensional requirements in the Bylaws.  Despite the fact that the Property is surrounded by a residential district to the north and east, and a commercial district to the south and west (which includes the residential apartment building owned by Mr. Swenor to the immediate west), the proposed retail use of the Project Building is a permitted use in the Village Industrial zoning district and the Project's design serves to mitigate its impact on the surrounding neighborhood.  The Project does not involve any expansion into the existing setbacks.  No new structures are proposed and the distance between the structures on the Property and those on adjoining lots will not change.  The proposal to remove the barn structure will work to decrease some of the structural

22

nonconformity on the Property.  The proposed loading ramp and dumpster will be on the south side of the building, shielded from the properties to the north and the west by the existing building.  The screening fence along the west side of the parking lot, landscaping along the northern and western property lines, blacking-out the windows on the north and south sides of the building, and use of down-shielded lighting will lessen the light, noise, and aesthetic impacts on neighboring properties.  These factors do not warrant a conclusion that enlargement would have an adverse effect on the neighborhood.

§§ 711(E), (F): The objective of the zoning district in which the lot and adjoining lots are located as defined in § 201 of the Bylaws; the suitability of the proposed enlargement of a structure to the character of the neighborhood.  To the extent the zoning district objectives specified in § 201 are relevant to the review of the enlargement of the Project Building, the Court notes that the proposed retail use is a permitted use in the Village Industrial district that upholds the purposes of providing nearby employment opportunities for residents without unduly impacting the capacity of community services and facilities.  See Bylaws § 201(D).  The new loading ramp, improvements to the parking area and the safety of circulation, and removal of the barn will improve the functionality of the Project Building for permitted uses within the district.  Proposed modifications such as additional landscaping and improvements to the façade of the Project Building will benefit the aesthetics of the Property from the road as well as from the neighboring properties and mitigate the Project's impacts on neighbors, tailoring it to the character of the area.  These factors do contribute to a finding of an adverse effect on the surrounding neighborhood.

§§ 711(G), (R): Whether an increase or change in business hours will result and the effect of such increase or change on adjoining uses and the neighborhood; whether there is a change from seasonal to year-round use.  The Project proposes an increase in the hours of operation from the prior use of the Property, though the use is a permitted one and the increase is not related to any proposed enlargement of nonconforming structures.   The Project expects to be open from 8:00 a.m. to 10:00 p.m., seven days a week, while VEMAS usually operated between 7:00 a.m. to 5:00 p.m. on weekdays.  Weekend and evening activity on the Property is not unprecedented, however, as VEMAS occasionally had a second manufacturing shift from 9:00

23

p.m. to 11:00 p.m., conducted building and equipment maintenance on some weekends, and Mr. Leiber also sold antiques in a limited capacity from the barn structure outside of VEMAS' hours of operation. This factor does not contribute to a finding of an adverse effect as the proposed modifications described elsewhere in this decision will mitigate the impact if the increased hours of operation.

§ 711(H): Whether the proposed use will result in an increase in noise, fumes, dust, or odors. Neither the Project as a whole nor any enlargement of a nonconforming structure will result in an increase in fumes, dust, or odors. Noise associated with the Project will be related to either parking lot activity or HVAC equipment, and the sound-level measurements in evidence demonstrate that both will be within the performance standards in the Bylaws. The Project will utilize the existing rooftop HVAC equipment that was also used by VEMAS. The Bylaws set the limit for daytime (7:00 a.m. to midnight) sound level received at a residential property at an average of 70 dBA (Leq) and an instantaneous maximum of 80 dBA (Lmax) and the nighttime (midnight to 7:00 a.m.) sound levels at an average of 50 dBA (Leq) and an instantaneous maximum of 60 dBA (Lmax). Bylaws § 1429. VHB took measurements of the HVAC system at the edge of the rooftop near the closest residential property line (60 Leq and 67 Lmax) during the day in the HVAC system's loudest setting, and modeled the sound levels at ear-level on the property line (40 Leq and 46 Lmax) and the level of an upper-floor window (40 to 45 Leq and 46 to 51 Lmax). The noise generated by the HVAC equipment complies with both the daytime and nighttime performance standards. The noise generated by parking lot activity will also comply with the performance standards in the Bylaws, as explained above in the Question 1 site review analysis. This factor does not support a finding of an adverse effect on the surrounding neighborhood.

§ 711(I): Whether greater volumes of vehicular traffic will be generated and what impact this greater volume will have on the use of adjoining lots, on the neighborhood, and on pedestrian and vehicular safety. To the extent it is relevant, and as the Court discussed in more detail in the site review analysis, the nearby intersections have excess capacity and new vehicle trips generated by the Project will have minimal impact on the nearby traffic network. As for pedestrian and vehicle safety, removing the barn will improve the ability of delivery drivers to

24

maneuver in and out of the loading area. The addition of a sidewalk connecting the parking lot to the main entrance and new lighting will improve the safety of the parking lot, as will closing the Church Street access and adding a chain barrier to the rear access point. Reducing the number of access points to a single entrance/exit on Route 30 will improve circulation on the site and prevent vehicles from cutting through the Property on the way to and from Main Street. This factor does not support a finding of an adverse effect on the surrounding neighborhood.

§ 711(J): Whether there will be an increase in the number of employees. The Project proposes to employ a maximum of ten employees, with about four to five on site during operating hours. This amounts to a decrease in the number of employees from the previous use.

§§ 711(K), (L): Whether there will be an increase in outdoor activity or outdoor storage; whether there is adequate off-street parking as required by the Bylaws. To the extent it is relevant, most of the Project's operations will occur inside the Project Building, with outdoor activity only in the loading area and the parking area. The loading area is located on the south side of the Project Building, so residences on the north and west sides of the Property will be shielded from activity in the loading area and on the new loading ramp by existing buildings. The proposed stockade fence on the west side of the parking lot will provide screening from the parking lot activity. As a preexisting nonconforming structure, the off-street parking does not meet the regulations on setbacks but otherwise conforms to the requirements in the Bylaws. These factors do not support a finding of an adverse effect on the surrounding neighborhood.

§ 711(M): Whether there will be an increase in storm drainage and lighting on adjoining lots and in the neighborhood. The Project will not increase storm drainage. To the contrary, replacing the barn structure with landscaping may reduce runoff. As previously explained, the proposed lighting will be designed so that it does not extend to neighboring properties.

§ 711(N), (O): Whether there will be screening and landscaping to lessen any adverse effects on adjoining lots and the neighborhood; whether there is an increase in the visibility of the use or structure from adjoining lots and from public ways. As the Court has already discussed in detail, Poultney Properties agreed to add § 201(D)(2) plantings along the property lines to the west and north, where there is space to do so, as well as to construct a six-foot stockade fence along the west side of the parking lot that will not allow headlights to shine through to the

25

neighboring property. While removal of the barn will increase the visibility of the Project Building from one direction on Route 30, removing the old structure could have a positive impact on the aesthetics of the Property. and it will be replaced by landscaping. Additional efforts to minimize the visual of the Project Building on neighbors include blacking out the windows on the north and south sides of the building, installing down-shaded lighting, and adding landscaping where the barn will be removed and where the Church Street access will be closed. These factors do not support a finding of an adverse effect on the surrounding neighborhood.

§§ 711(P), (Q): Whether the proposed use is providing a service to the neighborhood; whether there is an increase in safety risk to the neighborhood. Finally, to the extent it is relevant, the Project will be providing a service to the neighborhood by making use of a large, underutilized building and by providing a convenient source of consumer goods. None of the proposed modifications will result in an increased safety risk.

Considering each factor in the enhanced review under § 711, the Court finds that any proposed enlargement of the Project Building will not have an adverse effect on the surrounding neighborhood.

## Conclusion

The Court concludes that the Project conforms to each of the objectives identified in § 1203 of the Bylaws for site plan review and does not result in an enlargement of nonconformities in the meaning of Article VII. In reaching this conclusion we impose one condition: **We require one or more spotters to assist a tractor-trailer pulled forward into the loading area as it backs into the parking lot when exiting the Property in order to complete the maneuver safely.**

To the extent that the Project could be found to involve an enlargement of nonconforming structures, such enlargements comply with the requirements of § 710 and § 711.

The Court consequently **GRANTS** Poultney Properties' application for change of use and site plan approval for 61 Beaman Street.

A Judgment Order is issued concurrently with this decision. This concludes the matter before the Court.

Electronically Signed:  2/16/2022 2:42 PM pursuant to V.R.E.F. 9(d).

Thomas G. Walsh, Judge
Superior Court, Environmental Division